{¶ 1} The defendant-appellant, Jason Ingram, appeals the Allen County Common Pleas Court's July 17, 2008 judgment entry of conviction and sentencing. On appeal, Ingram contends that the trial court erred when it instructed the jury; that his convictions were against the manifest weight of the evidence; and that the trial court erred in imposing sentence. For the reasons set forth herein, we affirm the judgment of the trial court.
 {¶ 2} On June 12, 2008, the Allen County Grand Jury indicted Ingram on one count of having a weapon while under disability, a violation of R.C. 2923.13(A)(3), a third-degree felony, and one count of discharging a firearm on or near prohibited premises, a violation of R.C. 2923.162(A)(3), (C)(2), a third-degree felony. The charges resulted after multiple shots were fired on April 18, 2008 in the city of Lima. Ingram pled not guilty during arraignment, and a jury trial was held on July 14-15, 2008. The jury found Ingram guilty of both offenses, and the trial court sentenced Ingram to two, consecutive five-year prison terms. Ingram appeals the judgment of the trial court and asserts three assignments of error for our review.
 Assignment of Error No. 1 The trial court committed error by instructing the jury with Ohio Jury Instruction 405.25 titled "Consciousness of Guilt" upon the request of the State of Ohio over the objection of the Defendant. *Page 3 
 Assignment of Error No. 2 The court committed error prejudicial to the defendant in sentencing by considering factors not before the court by way of evidence or documentation at sentencing in violation of the Defendant's rights pursuant to the Fifth, Sixth, and Fourteenth amendments to the United States Constitution and Article One[,] Section Ten of the Ohio Constitution.
 Assignment of Error No. 3 Defendant's conviction was against the manifest weight of the evidence.
 {¶ 3} For ease of analysis, we elect to address the assignments of error out of order. In the third assignment of error, Ingram contends the jury clearly lost its way when determining his guilt, and his convictions were against the manifest weight of the evidence. A challenge based on the manifest weight of the evidence requires the court to sit "as a `thirteenth juror.'" State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting Tibbs v. Florida (1982),457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652.
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." *Page 4 
(Emphasis added.). Id. at 387, quoting Black's Law Dictionary (6 Ed. 1990), at 1594. When an appellant challenges a conviction based on the weight of the evidence, the court must review the entire record, weigh the evidence and "all reasonable inferences," consider witness credibility, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. To reverse a conviction based on the manifest weight of the evidence, a unanimous panel of three appellate judges must concur. State v. Michaels, 3d Dist. No. 13-99-41, 1999-Ohio-958, citing Thompkins, at 389.
 {¶ 4} R.C. 2923.13(A)(3) states:
 Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 * * *
 The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.
R.C. 2923.162(A)(3) and (C)(2) provide:
 No person shall do any of the following: *Page 5 
 * * Discharge a firearm upon or over a public road or highway.
 * * *
 Whoever violates this section is guilty of discharge of a firearm on or near prohibited premises. A violation of division (A)(1) or (2) of this section is a misdemeanor of the fourth degree. A violation of division (A)(3) of this section shall be punished as follows:
 * * *
 Except as otherwise provided in division (C)(3) or (4) of this section, if the violation created a substantial risk of physical harm to any person or caused serious physical harm to property, a violation of division (A)(3) of this section is a felony of the third degree.
 {¶ 5} The first witness to testify at trial was Tessa Gamble, who stated that she lived on St. Johns Avenue in Lima and was in her home at approximately 7:30 p.m. on April 18, 2008. (Trial Tr., Nov. 3, 2008, at 184-185). Gamble heard three gun shots and ran outside on her front porch. (Id. at 186). When she looked north, she observed an individual she knew as "J-Rock" fire two more shots across the street toward her house. (Id. at 186-187). Gamble saw "J-Rock" shoot at "one of the Island boys," who ran past her house and shouted, "bitch, you missed." (Id. at 192). Gamble went back into her house and called 9-1-1 to report the shooting because there had been multiple people outside who could have been injured, including her child and nephew. (Id. at 188-189; 194). *Page 6 
 {¶ 6} Gamble described "J-Rock" as wearing an all grey outfit at the time of the shooting. (Id. at 199). She identified Ingram in court as the person she knew as "J-Rock" and the person who she observed shooting a gun at approximately 7:30 p.m. on April 18, 2008. (Id. at 195-196). She also stated that Ingram was the only person she saw with a gun. (Id. at 188). On cross-examination, Gamble admitted that she and Ingram had had a one-night stand approximately four years prior to the incident, but she stated on re-direct that she did not bear a grudge against him. (Id. at 198).
 {¶ 7} Gamble's daughter, who was 15 years old at the time of the shooting also testified. She stated that she had been sitting on the porch with her young cousin when she heard an argument. (Id. at 208). She then heard shooting and observed "J-Rock" holding a gun. (Id. at 210). Gamble's daughter heard two more shots fired after she and her cousin ran inside Gamble's house. (Id. at 213). She also indicated that "J-Rock" had been wearing a grey jogging suit, and she had no doubt that Ingram was the same person she knew as "J-Rock" and the same person she observed shooting. Gamble's daughter also mentioned that many people were outside during the shooting.
 {¶ 8} George Caldwell testified that he is a patrolman for the Lima Police Department, and at approximately 7:30 p.m. on April 18, 2008, he answered a call from dispatch concerning a black male in grey firing shots on Catalpa and St. *Page 7 
Johns Avenue. (Id. at 225). Caldwell received a second dispatch that the shooter was shooting by the EZ Check store. (Id. at 226). Caldwell stopped his marked patrol car to wait for backup, but Ingram walked toward the car in an alley. (Id. at 227). When he saw Caldwell, Ingram reached in his waistband and pulled a gun. (Id. at 228). Caldwell ordered Ingram to stop, but he ran instead. (Id.). Ingram ran in front of Caldwell's patrol car a second time and pulled the gun again. (Id. at 229). Ingram ran between some apartment buildings, and Caldwell was unable to locate him until he was arrested by a different officer several minutes later. (Id.). After Ingram was arrested, the police were unable to locate the gun. (Id. at 241). Caldwell stated several times that he had no doubt Ingram had a gun in his possession when the chase began. (Id. at 242; 249). Caldwell testified that Ingram had a cut in his shoulder when he was arrested, and the injury looked like a scratch instead of a bullet wound. (Id. at 246; 251).
 {¶ 9} Jessica Donathan stated that she heard "shots pop off and had already observed "a cop" sitting in his car near her home. Donathan observed a man running with a "revolver" in his hand and saw him point the gun at the cop. (Id. at 254; 259). Donathan watched the man kick in a door at an apartment and enter the building. (Id. at 257). Donathan could not identify the man by name, but stated that he was dressed in grey, and she recognized him in court as the same person she had seen running. (Id. at 255). On cross-examination, Donathan stated *Page 8 
that she was not familiar with guns, and she seemed to have difficulty distinguishing a revolver from an automatic handgun. (Id. at 267-268). However, Donathan stated that she had no doubt Ingram had a gun when she observed him on April 18, 2008. (Id. at 270).
 {¶ 10} Scott Jones, a patrolman for the Lima Police Department, testified that he heard a dispatch that identified "J-Rock" as a shooter. (Id. at 274). Jones stated that he had had prior contact with "J-Rock" and was able to identify him by his given name. Jones stated that Ingram was known to be a dangerous person, so he responded to the call. (Id. at 274). Jones testified that he arrested Ingram as he tried to enter the front door of an apartment, and Ingram was wearing grey sweatpants and had a cut in his neck or shoulder area. (Id. at 278). Jones stated that the injury appeared to be a scratch and not a gun shot wound. (Id. at 278-279). Jones stated that Ingram did not have a gun when he was arrested, and that the back door to one apartment had a shoeprint approximately one-third to one-half of the way up the door, but neither the knob nor lock had been broken. (Id. at 290; 300). At the police station, Jones opened a GSR kit and swabbed both of Ingram's hands to search for gunshot residue. (Id. at 280).
 {¶ 11} Donna Rose, an employee of the Bureau of Criminal Identification and Investigation, tested the samples Jones had collected. Rose was qualified as an expert witness and testified that she found gunshot residue on both the right and *Page 9 
left hand samples. (Id. at 312). Rose stated it was not uncommon for an individual to have residue on both hands even if they shot with only one hand, and that her findings were not indicative of somebody actually firing a gun because the test she conducted would also detect particles from brake linings or certain fireworks. (Id. at 315; 319-320). The essence of Rose's testimony was not to ascertain how gunshot residue came to be on both of Ingram's hands but simply that the sample from each of his hands indicated the presence of gunshot residue. (Id. at 321).
 {¶ 12} Louis Acerro, a probation officer in Allen County, Ohio, testified that he supervised Ingram on probation following a 2004 drug conviction. (Id. at 324). The court admitted into evidence State's Exhibit 5, which was a certified copy of the judgment entry of conviction and sentencing in State v. Ingram, Allen County Common Pleas Court case number CR2004-0210. The exhibit indicated that Ingram had been convicted of possession of crack cocaine, a violation of R.C. 2925.11(A), (C)(4)(a), a fifth-degree felony.
 {¶ 13} Ingram testified on his own behalf. He stated that he went to the EZ Check store and talked to another man, Raylon Davis, who had an outstanding warrant. (Id. at 343). Ingram started to walk across the street when "shots started firing and then [Davis] pulled out a weapon, which I didn't know he had, he started shooting." (Id.). Ingram ran toward his mother's apartment, which is *Page 10 
where he was ultimately arrested. (Id. at 344). As he ran, he heard a total of ten gun shots. (Id. at 345). Ingram stated that he never had a gun, and that Caldwell and Donathan were mistaken about the object in his hand. (Id. at 359). Ingram explained that he had two cell phones with him that night. An Alltel cell phone had been in the pocket of his grey sweatpants and the other, a Verizon phone, had been attached by a clip to the waistband of his pants. (Id. at 348). As he ran, the cell phone on the clip fell off and flipped open. (Id.). Ingram grabbed the phone then continued to run without closing it, and he believed the object Caldwell and Donathan thought was a gun was actually his cell phone. (Id. at 349). Ingram testified that he ran from the police because he believed he had an outstanding warrant for trespassing in March 2008. (Id.).
 {¶ 14} When Ingram arrived at his mother's apartment, he found the door locked and was unable to gain entry to the residence. (Id. at 351). Ingram claimed he did not struggle when he was arrested, and that the injury to his shoulder was a gun shot wound. (Id. at 354). He denied being transported to the Lima Police Department and stated that he was transported directly to St. Rita's Hospital and then to the county jail. (Id. at 355). Ingram discounted Gamble's testimony by stating that she had a grudge against him because he had "disrespected her" in front of other people after their one-time sexual encounter. (Id. at 346). *Page 11 
 {¶ 15} The state opted not to cross-examine Ingram, but called John Allen, the jail administrator, to testify on rebuttal. Allen testified that all of Ingram's expensive items of personal property had been placed into heat-sealed bags at the jail, and his clothes had been taken to the property room. (Id. at 368). Allen brought the inventory sheet into court as well as the physical evidence showing the items the jail was holding for Ingram in the event he was released. The inventory sheet indicated "a cell phone," and only one Alltel cell phone was located in Ingram's possessions. (Id. at 369-371).
 {¶ 16} Despite minor inconsistencies in the witnesses' perceptions of time and despite inconsistencies in their descriptions of the gun they observed in Ingram's hand, the testimony was consistent that Ingram had been observed shooting across a public street at a man; that Ingram did possess a gun; and that many people were outside and in the vicinity of the shooting, which created a substantial risk of physical harm to any one of them. The evidence also showed that Gamble watched Ingram shoot at a specific person, which created a substantial risk of physical harm to that person. The evidence proved that Ingram was under disability due to his drug conviction in CR2004-0210.
 {¶ 17} The discrepancies between the state's witnesses' testimony and Ingram's testimony were glaring. The jury had the opportunity to observe the witnesses' demeanors during their testimony. Clearly, the jury disbelieved *Page 12 
Ingram's version of events and believed the state's witnesses. Since the trier of fact is charged with weighing the evidence and assessing witness credibility, we cannot hold that the jury clearly lost its way.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. The third assignment of error is overruled.
 {¶ 18} In the first assignment of error, Ingram contends the trial court abused its discretion when it instructed the jury on "consciousness of guilt." Trial courts have broad discretion in determining whether the evidence adduced at trial was sufficient to warrant a jury instruction. State v. Mitts (1998), 81 Ohio St.3d 223,228, 690 N.E.2d 522. An "`abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting State v.Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (internal citations omitted).
 {¶ 19} The Supreme Court of Ohio has held that "`[i]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself" (Emphasis added). State v. Eaton
(1969), 19 Ohio St.2d 145, 160, 249 N.E.2d 897, vacated on other grounds in (1972), 408 U.S. 935, 92 S.Ct. 2857, *Page 13 33 L.Ed.2d 750, quoting 2 Wigmore, Evidence (3 Ed.) 111, Section 276. InEaton, the defendant fled the scene of a homicide he had committed. Id. In State v. Williams (1997), 79 Ohio St.3d 1, 3, 679 N.E.2d 646, the defendant escaped from jail and went to the juvenile justice center, where he planned to kill three juvenile co-defendants. The court found this behavior to show his consciousness of guilt. Id. at 11.[1] InState v. Hand, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 167-169, the defendant attempted to escape from custody, which the court held showed his consciousness of guilt. This court has followed the Supreme Court's precedent when a defendant did not comply with police orders to come out of a home and concealed himself in the crawl space prior to his arrest. State v. McCullough, 3d Dist. No. 12-07-09,2008-Ohio-3055, at ¶ 40-41.
 {¶ 20} In this case, Caldwell testified that Ingram saw him in a marked police cruiser and ran in between buildings to avoid him. Gamble testified that she watched Ingram leave the area of the shooting by escaping between houses. Donathan testified that she observed Ingram running away from "the cop" and saw Ingram kick in the back door of an apartment, enter that apartment, and come back out shortly thereafter. Jones testified that he located Ingram trying to force entry through the front door of an apartment; that Ingram did not comply with orders to *Page 14 
stop; that Ingram used profanity directed at him; and that Ingram persisted in trying to enter the front door of the apartment. Jones stated that he knew Ingram would not comply with his orders, and he had to use physical force to get Ingram on the ground and arrest him. All of this evidence shows that Ingram fled from the crime scene, fled from police, attempted to conceal himself, and resisted arrest. Furthermore, Ingram admitted that he ran from the police, though he claimed he was afraid he would be picked up on an outstanding arrest warrant. On this record, we cannot find that the trial court abused its discretion when it instructed the jury on consciousness of guilt. The first assignment of error is overruled.
 {¶ 21} In the second assignment of error, Ingram contends the trial court erred by considering facts that were not found at trial or admitted by the defendant in violation of Blakely v. Washington (2004),542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. However, the statements cited in Ingram's brief were the statements of the assistant prosecutor, and his argument centers on the state's alleged misconduct. There is nothing in the record to demonstrate that the court considered the state's arguments. Furthermore, we note that trial courts have discretion in sentencing and are no longer required to make findings before imposing the maximum sentence or imposing consecutive sentences.State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. *Page 15 
 {¶ 22} The record reveals that the trial court considered the principles and purposes of felony sentencing set forth in R.C. 2929.11
and the seriousness and recidivism factors of R.C. 2929.12. The court reviewed a pre-sentence investigation report that had been prepared in 2003 in a prior case against Ingram. The court reviewed each of the charges and convictions and determined that Ingram showed no remorse for the offenses he had committed on April 18, 2008, and that he needed to be an example for others in the community who are "dealing with guns and shooting guns in this community[.]"[2] If any of the state's arguments were improper, there is no indication on the record that the court considered them when it imposed sentence, which was within the sentencing range for third-degree felonies. R.C. 2929.14(A)(3). The second assignment of error is overruled.
 {¶ 23} The judgment of the Allen County Common Pleas Court is affirmed.
Judgment Affirmed
 PRESTON, P.J., and ROGERS, J., concur.
[1] Ingram relies on the factual variations in Williams to argue that the law would somehow be inapplicable to his case. While we agree thatWilliams is certainly factually distinguishable, the principle of law is not, as indicated by the other cases cited above.
[2] We sua sponte note that the trial court's determination under R.C. 2929.12(B), that the victim suffered serious psychological harm, was not supported by the record, particularly since the victim taunted Ingram while running away from him. Having found none of the R.C. 2929.12(C) factors, and having found that recidivism was likely under R.C. 2929.12(D), the court determined that a prison term was consistent with the principles and purposes of criminal sentencing under R.C. 2929.11. Although the trial court erred by finding serious psychological harm to the victim, the error is not prejudicial in light of the court's recidivism findings. See generally State v. McClurg, 3d Dist. No. 1-05-5268, 2005-Ohio-5268. See also State v. Kalish, 120 Ohio St.3d 23,2008-Ohio-4912, 896 N.E.2d 124. *Page 1