[Cite as *State v. Williams*, 2025-Ohio-1151.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

     Plaintiff-Appellee,                       :            No. 24AP-292
                                                        (C.P.C. No. 22CR-5169)

v.                                                           :

                                                           (REGULAR CALENDAR)

Charles B. Williams,                              :

     Defendant-Appellant.                    :

---

D E C I S I O N

Rendered on March 31, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Sheryl L. Prichard* for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *Todd W. Barstow* for appellant. **Argued:** *Todd W. Barstow*.

---

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1}  Following a jury trial, defendant-appellant, Charles B. Williams, was found guilty of crimes associated with the October 22, 2022 fatal shooting of J.C. and nonfatal shooting at J.L. outside of a Columbus bar.  Mr. Williams appeals from the April 5, 2024 judgment of conviction entered by the Franklin County Court of Common Pleas and argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.  He also contends he received ineffective assistance of counsel at trial.  For the following reasons, we affirm.

## I.  PROCEDURAL BACKGROUND

{¶ 2}  On November 3, 2022, a Franklin County Grand Jury returned a six-count indictment charging Mr. Williams with purposeful murder, in violation of R.C.

2903.02(A)(1), an unspecified felony (Count 1); felony murder, in violation of R.C. 2903.02(A)(2), an unspecified felony (Count 2); felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree (Count 3); unlawful discharge of a firearm upon or over a public road or highway, in violation of R.C. 2923.162(A)(3) and (C)(2), a felony of the third degree (Count 4); tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree (Count 5); and improper discharge of a firearm at or into an occupied habitation, in violation of R.C. 2923.161(A)(1), a felony of the second degree (Count 6). Firearm specifications were included with all six counts. A few months later, a Franklin County Grand Jury returned an indictment charging co-defendant Lee Gill with identical offenses.

{¶ 3} These offenses pertained to the October 22, 2022 shooting death of J.C. in the Platform Lounge parking lot, a bar located at 1058 Country Club Road in Franklin County, Ohio. (*See* Feb. 27, 2024 Tr. Vol. I at 106; Ex. L.) Platform Lounge is located at the north end of a small strip mall, with a salon located in the middle and another business at the south end. (*See* Tr. Vol. I at 97-98; Ex. L.)

{¶ 4} A joint trial commenced on February 27, 2024. Following the presentation of evidence, the jury returned a verdict finding Mr. Williams guilty of felony murder (Count 2), felonious assault (Count 3), unlawful discharge of a firearm upon or over a public road or highway (Count 4), tampering with evidence (Count 5), and their corresponding specifications. The jury found Mr. Williams not guilty of the remaining two counts, purposeful murder (Count 1) and improper discharge of a firearm into an occupied habitation (Count 6).[1] At the request of the state and for good cause shown, the trial court subsequently entered a nolle prosequi on these two counts.

{¶ 5} At the April 5, 2024 sentencing hearing, the trial court imposed an aggregate sentence of 21 years to life imprisonment. Mr. Williams's convictions and sentence were

---

[1] The jury acquitted Mr. Gill of purposeful murder but convicted him of tampering with evidence. The jury was unable to reach a unanimous verdict as to the felony murder, felonious assault, unlawful discharge of a firearm upon or over a public road, and improper discharge of a firearm at or into a habitation counts in Mr. Gill's case, Franklin County Common Pleas case No. 23CR-0696. (*See* Mar. 4, 2024 Tr. Vol. IV at 624-28.)

memorialized in the trial court's April 5, 2024 judgment entry.[2]  Mr. Williams  now appeals from that judgment and raises the following two assignments of error for our review:

> [I.] THE TRIAL COURT ERRED AND DEPRIVED [MR. WILLIAMS] OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE [I,] SECTION [10] OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MURDER[,] FELONIOUS ASSAULT[,] TAMPERING WITH EVIDENCE[,] AND IMPROPER DISCHARGE OF A FIREARM, AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [II.] [MR. WILLIAMS'S] TRIAL COUNSEL WAS INEFFECTIVE, THEREBY DENYING HIM HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

## II.  FACTUAL OVERVIEW

{¶ 6}  The following facts were established at the February 2024 joint trial of Mr. Williams and his co-defendant, Mr. Gill.

{¶ 7}  At all relevant times, Mr. Gill and Mr. Williams worked security for Platform Lounge.  (*See* Tr. Vol. I at 42-47.)  On October 22, 2022, J.C. and J.L. went to Platform Lounge for a few drinks.  (Tr. Vol. I at 39-40, 61-63.)  Around 11:40 p.m., the two men decided to leave.  (Tr. Vol. I at 42. *See* Ex. A3, Channel 13.)  On their way out, Mr. Gill approached J.C. about leaving the bar with an alcoholic drink in his hand.  (Tr. Vol. I at 42-43, 60-61, 69-70; Ex. A3, Channel 13.)  The exchange between Mr. Gill and J.C. became heated, but J.L. was able to deescalate the situation.  (Tr. Vol. I at 43, 46-48.)  J.C. and J.L then got into J.L.'s white Dodge Challenger, which was parked in the Platform Lounge parking lot.  (Tr. Vol. I at 43-44, 50, 55-56.)

{¶ 8}  At trial, J.L. testified that as they were preparing to leave, he "heard a shot and then . . . heard a ricochet come through the passenger back panel window."  (Tr. Vol. I at 50.)  In response, J.L. (who was a licensed firearm permit holder) grabbed his firearm located on the back floorboard of his vehicle and exited his car.  (Tr. Vol. I at 48-50, 56-57.)  Surveillance video footage of the parking lot showed Mr. Gill, Mr. Williams, and a third

---

[2] Although not relevant to the issues presented in this appeal, we note the trial court entered an amended judgment of conviction in the case below on May 6, 2024 after Mr. Williams filed his notice of appeal.

man, Dominic Elmore, standing around the rear passenger side of J.L.'s parked car at 11:45 p.m. when J.L. opens the driver's door, the three men suddenly jump back, J.L. exits the vehicle while ducking, both Mr. Elmore and Mr. Gill pull out handguns, and Mr. Elmore begins rapidly firing at the car. (*See* Feb. 28, 2024 Tr. Vol. II at 370-76, 388, 416-17, 427-33; Ex. A3, Channel 16; Ex. A3, Channel 14.) In the video footage, while Mr. Williams is running away from the shooting to retrieve a rifle from the trunk of a car parked nearby (*see* Tr. Vol. II at 369-76; Ex. A3, Channel 15; Ex. A3, Channel 14; Ex. A3, Channel 13), J.C. can be seen crawling out of the driver's side door and running away from the vehicle towards Platform Lounge's south parking lot (*see* Ex. L), out of view of the surveillance camera and toward Country Club Road. (*See* Tr. Vol. I at 50, 57; Tr. Vol. II at 376-78; Ex. A3, Channel 16; Ex. L.)

{¶ 9} Although J.L. was not injured when he exited his car, he testified he did not know about J.C.'s condition after he exited the vehicle and ran away. (*See* Tr. Vol. I at 57; Tr. Vol. II at 376-78; Ex. A3, Channel 16; Ex. L.) And, on review, it is unclear from the surveillance video footage whether J.C. had been shot at that point. (*See* Ex. A3, Channel 16.) After the shooting stopped, J.L. got back into his vehicle, drove out of the lounge's parking lot, and attempted to locate J.C. (Tr. Vol. I at 49-51, 57-58, 64-65. *See also* Tr. Vol. II at 417-24.)

{¶ 10} Not long after the incident, J.C. was discovered lying face down on Country Club Road near Platform Lounge's south parking lot. (*See* Tr. Vol. I at 51-52, 65, 77-81, 128-29; Tr. Vol. II at 378; Ex. Q; Ex. B29; Ex. L.) Law enforcement and medics responded to the scene, where J.C. was pronounced dead at 12:10 a.m. on October 23, 2022 and transported to the morgue. (*See* Tr. Vol. II at 346-47; Ex. E.) At trial, the forensic pathologist who conducted the autopsy examination of J.C., Dr. Russell Uptegrove, testified J.C. would have been immediately paralyzed from the penetrating gunshot wound injury to his neck and died almost instantaneously because the bullet transected his brain stem. (*See* Ex. E; Feb. 29, 2024 Tr. Vol. III at 461-69, 480-81.) Based on that testimony, we can surmise J.C. had not yet been struck when he exited J.C.'s car and ran out of view of the surveillance cameras. (*See* Ex. A3, Channel 16.) During the autopsy, Dr. Uptegrove removed four lead fragments and three copper jacket fragments from the soft tissue of J.C.'s

neck, which were collected as evidence and submitted to the crime lab for analysis.  (*See* Tr. Vol. III at 479-80; Ex. M92; Ex. E.  *See also* Tr. Vol. II at 357-58; Ex. F.)

{¶ 11} Evidence presented at trial established J.L.'s car was struck by multiple rounds of bullets.  (*See* Tr. Vol. I at 63, 76, 204-18, 220; Ex. D; Ex. J.)  Although bullet fragments and a spent projectile were found in J.L.'s vehicle, these items were not sent to the crime lab for analysis.  (Tr. Vol. II at 391-92; Ex. J.)  Columbus Police Department ("CPD") Detective Derek Corbin testified that, based on his experience observing shooting scenes, it was his opinion that damage to the Dodge Challenger was caused by bullets fired from outside of the vehicle.  (Tr. Vol. II at 442-43.)

{¶ 12} Police recovered 17 seventeen spent shell casings fired from multiple firearms—including three spent rifle casings—and one spent projectile from Platform Lounge's parking lot on the morning of October 23, 2022.  (*See* Ex. L; Ex. B109; Tr. Vol. I at 119-21, 130-31, 135, 139-40; Tr. Vol. II at 387; Ex. F.)  Additionally, a woman who lived across the street from Platform Lounge, R.C., testified about bullets striking her home while she was inside that night.  (Tr. Vol. I at 33-34, 111-13, 127-28, 161, 173-74; Ex. H; Ex. B31 through B37.  *But see* Tr. Vol. II at 405-06.)  Her home is located approximately 50 feet from where J.C.'s body was found.  (*See* Tr. Vol. I at 129; Ex. L; Ex. B30.)  Police took photographs of the damage to R.C.'s home on the night of the incident. (*See* Tr. Vol. I at 111-14.)  But detectives could not identify exactly what struck R.C.'s home at trial because the police did not collect any evidence from her property.  (Tr. Vol. I at 127-28; Tr. Vol. II at 405-06.)

{¶ 13} Law enforcement reviewed surveillance video footage depicting the incident on October 24, 2022.  (*See* Tr. Vol. I at 165-66; Ex. I.  *See also* Ex. L (specifying locations of outdoor security cameras).)  The surveillance footage from a security camera located at the south corner of the strip mall showed Mr. Gill and Mr. Williams go out of view of the camera in a southbound direction—toward the area where J.C.'s body was found (*see* Ex. L; Ex. B27)—and depicted movement suggesting a gun was fired in that area.  (*See* Tr. Vol. I at 165-66, 177, 180-81; Tr. Vol. II at 378-79, 434-36.  *See also* Ex. A3, Channel 16.)  In that video, Mr. Gill can be seen racking the slide on his handgun backwards while walking toward Platform Lounge's south parking lot and disappearing from view of the surveillance camera for about 25 seconds.  (*See* Tr. Vol. II at 378-79; Ex. A3, Channel 16.)  Mr. Williams

follows after Mr. Gill with his rifle in tow, disappearing from the surveillance camera's view for approximately five seconds before running back into the frame toward the lounge's front entrance. (Tr. Vol. II at 378-79; Ex. A3, Channel 16.) At 11:47 p.m., Mr. Gill, Mr. Williams, and Mr. Elmore can be seen walking into Platform Lounge together. (Ex. A3, Channel 16; Tr. Vol. II at 379.) Less than two minutes later, Mr. Gill gets into his vehicle and leaves. (Ex. A3, Channel 14; Tr. Vol. II at 369-70, 374, 380-81, 440.)

{¶ 14} Detective Richard Bair explained that law enforcement did not initially search Platform Lounge's south parking lot when collecting evidence in the early morning of October 23, 2022 because it was not designated within the taped-off crime scene area. (*See* Tr. Vol. I at 122-24, 149, 154. *See also* Tr. Vol. II at 411-13.) After reviewing video surveillance footage depicting Mr. Gill and Mr. Williams running toward the south parking lot near where J.C.'s body was found (*see* Ex. B25; Ex. B27), detectives searched that area for additional evidence on October 24, 2022 around 12:00 p.m., approximately 36 hours after the shooting incident. (*See* Ex. I; Tr. Vol. I at 177, 187-201; Tr. Vol. II at 389-93.) Five 9mm Ruger Hornady shell casings and two spent projectiles were recovered from the south parking lot near the south corner of the strip mall. (Ex. I; Tr. Vol. I at 177, 187-201; Ex. C2; Ex. C4.) Although the shell casings were submitted to the CPD crime lab for analysis, the two spent projectiles were not. (Tr. Vol. II at 390-91. *See also* Tr. Vol. II at 407.)

{¶ 15} At trial, J.L. identified Mr. Williams as one of the three shooters (Tr. Vol. I at 54-55) and described seeing Mr. Williams point an "AR" rifle in his direction when J.L. exited his vehicle. (Tr. Vol. I at 50, 81-82. *See also* Tr. Vol. II at 351; Ex. A3, Channel 16.) And surveillance video showed Mr. Williams pointing and firing a rifle in the direction of J.L.'s parked vehicle. (Tr. Vol. II at 363-65, 370-77, 386-87; Ex. A3, Channel 7; Ex. A3, Channel 13; Ex. A3, Channel 14; Ex. A3, Channel 15.)

{¶ 16} Detective Corbin testified that no rifles were recovered during law enforcement's investigation of the incident. (Tr. Vol. II at 365.) We note, however, that shortly after J.L. drove away, the surveillance video footage shows Mr. Williams putting the rifle into the trunk of the car he retrieved it from, getting it back out a few minutes later, and taking the rifle into Platform Lounge around 11:50 p.m. (Tr. Vol. II at 363-65; Ex. A3, Channel 7; Ex. A3, Channel 14.) Thus, although he could not make any comparison to any particular rifle since none were recovered in connection with this incident, CPD firearms

examiner Caleb Worley opined the three rifle casings recovered from Platform Lounge's front parking lot (*see* Ex. H; Ex. L) were fired from the same rifle. (Tr. Vol. II at 259-61, 274-75; Ex. F, Firearms Report at 1; Ex. G20 through G24.) Of note, no rifle casings were recovered from Platform Lounge's south parking lot. (Tr. Vol. II at 389; Ex. I; Ex. L.)

{¶ 17} Law enforcement also identified Mr. Gill and Mr. Elmore as the other two shooters involved in the incident. (*See* Tr. Vol. II at 348-52, 363-65, 368-82; Ex. A3, Channel 13.)

{¶ 18} Regarding Mr. Elmore, the surveillance video depicted him firing a handgun multiple times at J.L.'s vehicle while it was parked in Platform Lounge's front parking lot. (*See* Ex. A3, Channel 16.) Detectives subsequently executed a search warrant upon his residence and recovered a semi-automatic Glock 9mm Luger pistol. (Tr. Vol. II at 359-60, 383-85. *See also* Ex. H; Ex. R.) After comparing test fires from that pistol to the ballistics evidence from the scene, firearms examiner Worley opined that fourteen of the shell casings recovered from Platform Lounge's front parking lot on October 23, 2022 (*see* Ex. H; Ex. L) were fired by the pistol seized from Mr. Elmore's home. (Tr. Vol. II at 258-60, 268-73, 277-79, 309, 314, 359-60, 402-03; Ex. F, Firearms Report at 1-2; Ex. G1 through G19; Ex. G31 through G34.) Mr. Worley further determined the spent Hornady 9mm Luger shell casings recovered from the south parking lot were not fired by that Glock pistol. (*See* Tr. Vol. II at 280; Ex. F; Ex. G36.)

{¶ 19} Mr. Gill was also depicted on the surveillance video pointing a handgun at J.L.'s parked car multiple times. (*See* Ex. A3, Channel 16; Ex. A3, Channel 13; Ex. A3, Channel 14. *See* Tr. Vol. II at 433.) The handgun used by Mr. Gill was never recovered by law enforcement. (*See* Tr. Vol. II at 381, 388.) At trial, firearms examiner Worley testified that one of the spent Hornady 9mm Luger shell casings recovered from Platform Lounge's front parking lot on October 23, 2022 (*see* Ex. H; Ex. L) and all five of the spent Hornady 9mm Luger shell casings recovered from the south parking lot on October 24, 2022 (*see* Ex. I) were fired from the same gun. (Tr. Vol. II at 261-63, 275-77; Ex. F, Firearms Report at 1; Ex. G25 through G30.) Although another handgun (a Ruger 9mm Luger pistol) was recovered from Platform Lounge's office by police on October 23, 2022 (Ex. H), Mr. Worley testified that none of the shell casings recovered from either of Platform Lounge's parking lots were fired from that gun. (Tr. Vol. II at 261-63, 279-77, 281; Ex. G35. *See also* Ex. F.)

{¶ 20} J.L. acknowledged he did not see who shot J.C. or know exactly when J.C. was shot. (Tr. Vol. I at 64, 76. *See also* Tr. Vol. II at 418.) At trial, firearms examiner Worley opined that the four lead fragments and the three copper jacket fragments recovered from J.C.'s neck by the coroner were not fired by any of the three pistols seized by police—one from J.L.'s impounded car, another from Platform Lounge's office, and one from Mr. Elmore's residence—in connection with this incident. (Ex. F at 2; Tr. Vol. II at 262-63, 280-82; Ex. G37 through G41.) Mr. Worley was unable to determine the caliber and type (e.g., full metal jacket or hollow point) of the bullet fragments[3] recovered from J.C.'s neck "due to deformation" and their small size. (Ex. F, Firearms Worksheet A at 7. *See also* Tr. Vol. II at 266-68, 284-86, 290-92, 312-13.)

{¶ 21} Based on his visual observation of one of the copper jacket fragments recovered from J.C.'s neck, Mr. Worley noted that particular fragment "appear[ed] to be the tip of the nose section of a bullet," which would be "consistent with those [types] of bullets typically loaded in rifle cartridges." (Ex. F, Firearms Worksheet A at 7. *See also* Tr. Vol. II at 266-68, 312, 315.) But, on cross-examination, Mr. Worley admitted "[t]here were no rifling characteristics on that particular fragment" and he could not actually say *that* copper jacket fragment was the tip of a rifle bullet. (Tr. Vol. II at 285-86.) Notably, Mr. Worley was not asked to analyze any of the projectiles or bullet fragments observed (and, in some instances, recovered from) either of Platform Lounge's two parking lots, the nearby residence struck by bullets, or J.L.'s car. (*See* Tr. Vol. II at 288-89, 298-99.)

{¶ 22} J.L. maintained he did not retrieve his firearm—a .40-caliber Smith & Wesson semi-automatic pistol (Tr. Vol. I at 71, 82; Ex. J; Tr. Vol. II at 383)—from the floorboard of his car until after the shooting began. (Tr. Vol. I at 48-49, 57, 70-72.) He also maintained his firearm was not discharged that night. (Tr. Vol. I at 49, 57, 82-83.) Evidence presented at trial supported his claim. Indeed, after law enforcement recovered the Smith & Wesson pistol from J.L.'s impounded vehicle, test fires from that handgun were compared to the ballistics evidence recovered from the scene. (*See* Ex. J; Ex. F; Tr. Vol. II at 280-81, 311-12, 314, 360.) Mr. Worley opined the Smith & Wesson pistol recovered from J.L.'s vehicle did not fire any of the spent shell casings recovered from the scene or the spent

---

[3] Mr. Worley explained that a "projectile is what leaves the barrel of the gun"—i.e., a bullet—which can break apart and create fragments when it hits its final target. (Tr. Vol. II at 290. *See also* Tr. Vol. II at 406-07.)

bullet fragments recovered from J.C.'s neck during the autopsy. (*See* Ex. F; Tr. Vol. II at 280-81, 311-12, 314, 360. *See also* Tr. Vol. II at 441.) Moreover, a fully loaded magazine and chambered round were recovered from the Smith & Wesson pistol law enforcement found in J.L.'s vehicle. (*See* Ex. J. *See also* Tr. Vol. II at 360.) J.L. also testified that J.C. was unarmed on the night of the incident (Tr. Vol. I at 49, 53, 71, 77), and no evidence presented at trial contradicted that testimony (*see* Tr. Vol. II at 360-61, 397, 439).

{¶ 23} Mr. Williams did not testify at trial, as was his right.

### III. ANALYSIS

#### A. First Assignment of Error: Insufficient Evidence and Manifest Weight

{¶ 24} In his first assignment of error, Mr. Williams argues the evidence presented at trial was insufficient to support his convictions for felony murder, felonious assault, tampering with evidence, and unlawful discharge of a firearm upon or over a public road or highway. He also contends these four convictions were against the manifest weight of the evidence. For the following reasons, we disagree.

#### 1. Legal Standard and Standard of Review

{¶ 25} Whether evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial. *See*, *e.g.*, *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7 (10th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 26} In evaluating a sufficiency challenge, we assume the state's witnesses testified truthfully and determine whether that testimony and any other evidence presented at trial satisfied each element of the offense. *See State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), quoting *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.). Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 27} In contrast, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See*, *e.g.*, *State v. Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87. "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). "[W]eight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), quoting *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 28} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 2022-Ohio-4175, ¶ 26. In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See*, *e.g.*, *Sparre v. Ohio Dept. of Transp.*, 2013-Ohio-4153, ¶ 10 (10th Dist.); *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 29} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See*, *e.g.*, *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 2021-Ohio-3803, ¶ 64 (10th Dist.), citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 2012-Ohio-1017, ¶ 31 (10th Dist.), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 30} To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-*

*Wollman v. Domonko*, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

### 2. Analysis

{¶ 31} At the outset, we note the jury was instructed it could find Mr. Williams guilty of all counts and specifications of the indictment as a principal offender *or* under a complicity theory for aiding and abetting. (*See* Mar. 5, 2024 Jury Instructions at 6.) Significantly, Mr. Williams did not argue in his merit brief that the state's evidence was insufficient to convict him of **complicity** to commit felony murder, felonious assault, tampering with evidence, or unlawful discharge of a firearm on or over a public road. Nor did he contend that the jury's verdict under a complicity theory was against the manifest weight of the evidence.

{¶ 32} R.C. 2923.03(A)(2) prohibits a person from aiding or abetting another in committing an offense. To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. *See, e.g.*, *State v. McFarland*, 2020-Ohio-3343, ¶ 26-29; *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. Such criminal intent can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed. *McFarland* at ¶ 39; *Johnson* at 245. It may also be inferred from the circumstances surrounding the crime. *Columbus v. Bishop*, 2008-Ohio-6964, ¶ 41 (10th Dist.).

### a. Felony Murder of J.C.

{¶ 33} In order to convict Mr. Williams of felony murder, the state had to prove that he, as either the principal offender or an aider and abettor of another, caused the death of J.C. as a proximate result of committing or attempting to cause physical harm to another by means of a deadly weapon. R.C. 2903.02(B); R.C. 2903.11(A)(2). (*See* Nov. 3, 2022 Indictment.) Under R.C. 2901.01(A)(3), "physical harm to persons" refers to "any injury, illness, or other physiological impairment, regardless of its gravity or duration." In Ohio, felony murder is a strict liability offense, because although "intent to commit the predicate felony is required, intent to kill is not." *State v. Nolan*, 2014-Ohio-4800, ¶ 9.

{¶ 34} Complicity is implied in every criminal indictment. *See, e.g., State v. Herring*, 94 Ohio St.3d 246, 251 (2002). Unlike conspiracy, complicity does not require a tacit understanding to commit an offense, but the defendant may be an aider or abettor in the commission of the offense. *See McFarland* at ¶ 26-29. In this case, the evidence at trial was sufficient to support a conviction based on Mr. Williams's participation and complicity in the murder of J.C.

{¶ 35} It is true that the firearm in Mr. Gill's possession on the night of the incident was not recovered and, thus, could not be compared to the spent shell casings found in the south parking lot. It is also true the firearms analyst could not definitively determine what type of gun fired the fatal shot to J.C.'s neck. However, "the identity of the principal is not an element that the state must prove to establish the offense of complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2)." *In re T.K.*, 2006-Ohio-3056, ¶ 14. "When an individual acts to aid or abet a principal in the commission of an offense, the individual and principal are equally guilty and the individual is prosecuted and punished as if he were a principal offender." *State v. Shabazz*, 2016-Ohio-1055, ¶ 21.

{¶ 36} Here, testimony and video surveillance footage established that after Mr. Elmore began shooting at J.L. and J.C., Mr. Williams ran away from the shooting, retrieved a firearm from a vehicle, ran back over to J.L.'s car, and fired multiple rounds in the direction of J.C. and J.L. The video surveillance footage also showed Mr. Williams (while carrying his rifle) follow Mr. Gill (seen racking the clip on his handgun) out of view of the surveillance camera to the south parking lot, where J.C.'s body was ultimately found. (*See* Ex. L.) The coroner testified J.C. would have been almost instantaneously paralyzed after being shot in the neck. It is undisputed that a penetrating gunshot wound to the neck caused J.C.'s death that night. (*See* Ex. E.) Even if the evidence did not sufficiently establish who shot J.C. in the neck, Mr. Williams concedes he possessed and discharged a rifle outside of Platform Lounge on October 22, 2022. (*See* Appellant's Brief at 2-3; Ex. A3.) The act of discharging a firearm at another is sufficient proof of intent to cause physical harm to another with a deadly weapon. *See, e.g., State v. Green*, 58 Ohio St.3d 239, 240-42 (1991); *State v. Thompson*, 1997 Ohio App. LEXIS 5134, *5-6 (10th Dist. Nov. 10, 1997).

{¶ 37} Viewing this evidence in the light most favorable to the state, as we must, we find the evidence is sufficient evidence for a rational trier of fact to conclude that Mr.

Williams—at a minimum—assisted, supported, or cooperated in the felony murder of J.C.[4] For these same reasons, we likewise cannot say the jury clearly lost its way and created a manifest miscarriage of justice in finding Mr. Williams guilty of felony murder as the principal offender or as an aider and abettor through R.C. 2923.03(A)(2).

### b. Felonious Assault of J.L.

{¶ 38} In order to convict Mr. Williams of felonious assault, the state had to prove that he, as either the principal offender or an aider and abettor of another, knowingly caused or attempted to cause physical harm to J.L. by means of a deadly weapon. R.C. 2903.11(A)(2).

{¶ 39} As described above, the testimony and video surveillance footage established that, after Mr. Elmore began shooting at J.L. and J.C. from close range, Mr. Williams ran away from the shooting, retrieved a rifle from a vehicle, ran back over to J.L.'s car, and fired multiple rounds in the direction of J.L. Although J.L. was not struck with a bullet, the act of discharging a firearm at another is sufficient proof of intent to cause physical harm with a deadly weapon. *See, e.g.*, *Green* at 240-42; *Thompson* *5-6.

{¶ 40} In this matter, the distinction between sufficiency and manifest weight is not significant. Under any test, the evidence was both sufficient and credible, as the jury found, in order to prove Mr. Williams guilty of the felonious assault of J.L. either as the principal offender or as an aider and abettor.

### c. Unlawful Discharge of a Firearm Upon or Over a Public Road

{¶ 41} R.C. 2923.162(A)(3) proscribes the offense of discharge of a firearm on or near prohibited premises. Mr. Williams was convicted of a violation of subsection (A)(3), which provides that "[n]o person shall . . . [d]ischarge a firearm upon or over a public road or highway." *Id*. A violation of this subsection constitutes a felony of the third degree where the offender's conduct "created a substantial risk of physical harm to any person or caused serious physical harm to property." R.C. 2923.162(C)(2). In the absence of such harm, the offense constitutes a misdemeanor of the first degree. R.C. 2923.162(C)(1).

---

[4] Although the jury was instructed on self-defense, Mr. Williams does not challenge the manifest weight of the evidence supporting the jury's evaluation of that affirmative defense. *See State v. Messenger*, 2022-Ohio-4562, ¶ 26-27 (holding that self-defense, as an affirmative defense, is subject only to manifest-weight review on appeal). In any event, as explained in our analysis of Mr. Williams's second assignment of error, such contention would be unavailing.

{¶ 42} Regarding the risk of harm to persons, R.C. 2901.01(A)(8) defines "[s]ubstantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." "The act of shooting in an area where individuals are located and in the range of the shooter creates a substantial risk of physical harm." *State v. Spates*, 2015-Ohio-1014, ¶ 67 (8th Dist.), citing *State v. Ingram*, 2009-Ohio-1302, ¶ 16 (3d Dist.) and *State v. Windom*, 1997 Ohio App. LEXIS 6006 (10th Dist. Dec. 30, 1997). *See also Green*, 58 Ohio St.3d at 240-42; *Thompson*, 1997 Ohio App. LEXIS 5134 at *5-6.

{¶ 43} Here, R.C. testified her home was struck with multiple bullets during the October 22, 2022 shooting incident in the Platform Lounge parking lot. Photographs taken by police on the night of the incident showed bullet strikes to her home. (*See* Tr. Vol. I at 111-14.) R.C.'s home was located across the street from Platform Lounge. (Ex. L; Tr. Vol. I at 161.) Testimony established that a gun fired from Platform Lounge's parking lot could "easily" hit R.C.'s home. (*See* Tr. Vol. I at 173-74. *See also* Ex. B59; Ex. L)

{¶ 44} It is undisputed that after Mr. Elmore began firing at J.L.'s vehicle, Mr. Williams retrieved a rifle and fired several times from Platform Lounge's parking lot. All shots were fired away from Platform Lounge, and thus, towards the public roadway that was adjacent to the lounge's parking lot. (*See* Ex. A3, Channel 16.) The act of firing a gun over a roadway towards—and ultimately striking—an occupied structure creates a strong possibility of physical harm to another.

{¶ 45} Again, the distinction between sufficiency and weight is not significant as to this offense. Under any test, the evidence was both sufficient and credible to prove, as the jury found, Mr. Williams guilty, either as the principal offender or as an aider and abettor, of unlawfully discharging a firearm upon or over a public road, thereby creating a substantial risk of physical harm to any person or causing serious physical harm to property. R.C. 2923.162(A)(3), (C)(2).

### d. Tampering with Evidence

{¶ 46} In order to convict Mr. Williams of tampering with evidence, the state had to prove that he, as either the principal offender or an aider and abettor of another, knowing that an official proceeding or investigation was in progress or was about to be or likely to

be instituted, altered, destroyed, concealed, or removed a firearm with purpose to impair its value or availability as evidence in such proceeding or investigation.  R.C. 2921.12(A)(1).

{¶ 47}  Tampering with evidence requires a person to act with purpose, meaning the person has a specific intention to cause a certain result.  *See* R.C. 2901.22(A).  That purpose is generally shown by circumstantial evidence.  Indeed, this court has held that sufficient evidence to support a tampering-with-evidence conviction exists where a defendant hides a gun used in a shooting immediately after the incident.  *See State v. Hill*, 2016-Ohio-5205, ¶ 5 (10th Dist.); *State v. Dantzler*, 2015-Ohio-3641, ¶ 36 (10th Dist.).

{¶ 48}  In this case, Mr. Williams's specific intent to impair the investigation after the shooting can be inferred from the fact that police could not find the rifle at Platform Lounge.  The video surveillance footage showed Mr. Williams remove the rifle from the trunk of a vehicle, use it, and then return it to the trunk of that same vehicle.  (*See* Ex. A3, Channel 14.)  Before police arrived, Mr. Williams retrieved that rifle from the vehicle's trunk and brought it inside the bar.  (*See* Ex. A3, Channel 14; Ex. A3, Channel 7.)  Although police arrived shortly after the shooting and searched Platform Lounge, they did not locate the rifle inside the bar.  (*See* Tr. Vol. I at 96-97, 106-07, 162-64; Tr. Vol. II at 323.)  Indeed, Detective Corbin testified the rifle used by Mr. Williams was never recovered.  (Tr. Vol. II at 364.)  Thus, we find sufficient evidence exists to support Mr. Williams's tampering-with-evidence conviction, and it is not against the manifest weight of the evidence.

{¶ 49}  Based on the foregoing, Mr. Williams's contention that his four convictions were not supported by sufficient evidence or, in the alternative, are against the manifest weight of the evidence is not well-taken.  As such, we overrule his first assignment of error.

**B.  Second Assignment of Error: Ineffective Assistance of Counsel**

{¶ 50}  In his second assignment of error, Mr. Williams argues he received ineffective assistance of counsel.  However, because he fails to establish he was prejudiced by trial counsel's deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), we must overrule this assignment of error, for the reasons that follow.

**1.  Controlling Law and Standard of Review**

{¶ 51} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or objectively unreasonable, as determined by " 'prevailing professional norms,' " and (2) counsel's deficient performance

prejudiced the defendant. *State v. Spaulding*, 2016-Ohio-8126, ¶ 77, quoting *Strickland* at 694.

{¶ 52} To show trial counsel's performance was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).

{¶ 53} Prejudice results when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bradley* at 142, quoting *Strickland* at 694. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.*, quoting *Strickland* at 694.

{¶ 54} When analyzing an ineffective assistance of counsel claim, an appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland* at 697. *See also State v. Wade*, 2021-Ohio-4090, ¶ 19 (10th Dist.). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland* at 697.

### 2. Analysis

{¶ 55} Mr. Williams asserts his trial counsel was ineffective in failing to present any evidence to support a claim of self-defense. At the same time, Mr. Williams acknowledges the trial court nonetheless instructed the jury on self-defense notwithstanding this purported deficiency. (Appellant's Brief at 4-6.)

{¶ 56} Though Mr. Williams summarizes the evidence and testimony presented at trial that he believes support his self-defense claim in his brief, he fails to specifically explain why he believes his trial counsel failed to follow "elementary defense tactics" or how, had these "elementary tactics" been employed, the outcome of his trial would have been

different. (Appellant's Brief at 4-8.) He does not take issue with the propriety of the self-defense instructions that were given. And, to the extent Mr. Williams believes his trial counsel was deficient in failing to present evidence or testimony relevant to his self-defense claim at trial, a postconviction petition—not a direct appeal—is the proper place to present matters relating to evidence outside the record. *See Morgan v. Eads*, 2004-Ohio-6110, ¶ 13 ("[A] bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings at trial.").

**{¶ 57}** In any event, we need not address the deficient performance prong of *Strickland. See Strickland* at 697. This is because, upon our review of the entire record—and in light of the fact that the jury was ultimately instructed on self-defense by the trial court—we do not find support for Mr. Williams's ambiguous and broad contention that he was prejudiced by counsel's purported failure to "follow[] elementary defense tactics." (Appellant's Brief at 8.) Without prejudice, trial counsel's performance need not be considered. *See, e.g., Strickland* at 697; *Wade*, 2021-Ohio-4090, at ¶ 19.

**{¶ 58}** "Under Ohio's common law, the elements of a valid self-defense claim have traditionally been stated as follows: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the defendant must not have violated any duty to retreat or avoid the danger."[5]  *State v. Patterson*, 2025-Ohio-280, ¶ 81 (10th Dist.) (Edelstein, J., dissenting), citing *State v. Melchior*, 56 Ohio St.2d 15, 20-21 (1978), and *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. "The Supreme Court of Ohio has held that these elements are cumulative, such that the absence of one precludes the jury from finding the defendant acted in self-defense." *Patterson* at ¶ 81 (Edelstein, J., dissenting), citing *State v. Cassano*, 2002-Ohio-3751, ¶ 73.

---

[5] As to the third element of a self-defense claim—i.e., "duty to retreat" requirement—we note that, effective April 6, 2021, the General Assembly amended R.C. 2901.09 as to that element. R.C. 2901.09(B) provides in relevant part: "For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(C) further provides that "[a] trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense . . . reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety." Here, the shooting incident occurred on October 22, 2022, after the amendments to R.C. 2901.09 took effect.

{¶ 59} When the "evidence presented . . . tends to support that the accused person used the force in self-defense," the state must prove, beyond a reasonable doubt, the defendant did not use force in self-defense. R.C. 2901.05. *See also State v. Brooks*, 2022-Ohio-2478, ¶ 23 (holding that 2018 Am.Sub.H.B. No. 228's burden-shifting amendment to R.C. 2901.05 "applies prospectively to all trials occurring after its effective date, regardless of when the underlying alleged criminal conduct occurred"); *State v. Messenger*, 2022-Ohio-4562, ¶ 19-25 (holding the state's burden of persuasion is not triggered until the defendant produces "legally sufficient evidence" supporting each element of self-defense).

{¶ 60} In this case, none of the evidence presented at trial established that J.C. or J.L., while seated in a parked vehicle, posed ***any*** threat of harm—much less, imminent danger of death or great bodily harm—to Mr. Gill, Mr. Williams, or Mr. Elmore. Yet, inexplicably, Mr. Gill and Mr. Elmore both brandished handguns and Mr. Elmore began firing multiple shots (at least fourteen) in the direction of J.C. and J.L. While Mr. Elmore was shooting, Mr. Williams ran away from the affray, retrieved a rifle from a nearby vehicle, ran back to the affray, and fired in the direction of J.L.'s parked car. And, after J.C. ran away from the affray, Mr. Gill and Mr. Williams followed him to the south parking lot with their guns. Though J.C.'s shooting death is not captured on video surveillance and no one who testified at trial witnessed the shooting firsthand, he was found near the south parking lot with a fatal gunshot wound to the neck. Testimony from the coroner indicated this injury would have almost immediately paralyzed J.C., meaning he would have been unable to walk any considerable distance after he was shot.

{¶ 61} Based on this evidence, we conclude the state satisfied its burden in disproving, beyond a reasonable doubt, any claim of self-defense in this case. We therefore conclude Mr. Williams fails to establish on appeal a reasonable probability that the outcome of his trial would have been different had his counsel "present[ed] any evidence to support that defense." (Appellant's Brief at 4.)

{¶ 62} For these reasons, we find Mr. Williams is unable to demonstrate he received ineffective assistance of trial counsel and, thus, overrule his second assignment of error.

## IV. CONCLUSION

{¶ 63}   Having overruled Mr. Williams's two assignments of error, we affirm the April 5, 2024 judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON, P.J. and DINGUS, J., concur.

—————————————