[Cite as *State v. Rodgers*, 2026-Ohio-418.]

THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-653 |
| | | (C.P.C. No. 19CR-4201) |
| v. | : | |
| | | (ACCELERATED CALENDAR) |
| Darrell L. Rodgers, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 10, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Brendan Inscho* for appellee.
**Argued:** *Brendan Inscho.*

**On brief:** *Eric W. Brehm* for appellant.
**Argued:** *Heather Landis.*

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Darrell L. Rodgers, appeals from an October 9, 2023 judgment entry after being found guilty, pursuant to a jury trial, of robbery, kidnapping, and rape. For the reasons that follow, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On August 26, 2019, appellant was indicted by a Franklin County Grand Jury on two counts of robbery in violation of R.C. 2911.02, felonies of the second and third degree (Count One and Two); five counts of rape in violation of R.C. 2907.02, felonies of the first degree (Counts Three to Seven); and one count of kidnapping in violation of R.C. 2905.01, a felony of the first degree (Count Eight). On August 28, 2019, appellant entered a plea of not guilty. This matter proceeded to a jury trial at which the following evidence was adduced.

{¶ 3} Ben Branford is a patrol officer with the Columbus Division of Police. (Aug. 29, 2023 Tr. Vol. 1 at 17-18.) During the early hours of August 17, 2019, Branford responded to a call for service regarding a rape at gunpoint in the area of 50 West 9th Avenue. (Tr. at 19-20.) The location of the incident occurred near the Ohio State University ("OSU") campus in Columbus, Ohio. (Tr. at 25.) Branford recalled the description of the suspect as a black male approximately 5-9 to 5-11 feet tall wearing an orange jacket and gray sweatpants with white stripes down the side. (Tr. at 20.) When Branford arrived, he noticed that an individual, later identified as appellant, was at the scene and matched the description of the suspect. (Tr. at 21-22.) When asked what he was doing that morning, appellant responded that "he was out jogging." (Tr. at 22.) When Branford attempted to detain appellant, he "took off running." (Tr. at 23.) After a brief chase, law enforcement apprehended appellant. (Tr. at 23.) During the arrest, Branford discovered a BB gun in appellant's right pocket. (Tr. at 27.) Branford recalled that during his pursuit of appellant, "it appeared that something came off of his body or he threw something or lost something along the way." (Tr. at 23.) When Branford retraced his steps from the chase, he found a black T-shirt and a social security card. (Tr. at 24.) Branford recalled that the name on the social security card was A.B. (Tr. at 29.) Branford identified appellant in the courtroom as the suspect arrested on the night in question. (Tr. at 24.)

{¶ 4} On cross-examination, Branford conceded that appellant did not have an orange jacket or anything covering his face as initially described. (Tr. at 31.) Branford also acknowledged that it was possible appellant did not run until Branford told him that he would be detained. (Tr. at 35.) When Branford arrested appellant, he did not notice any blood on him or his clothes. (Tr. at 38.)

{¶ 5} Kofi Owusu-Ansah is a patrol officer with the Columbus Division of Police. (Tr. at 39-40.) On August 17, 2019, Owusu-Ansah responded to a call for service regarding a rape at gunpoint in the area of West 9th Avenue. (Tr. at 41.) When appellant started to flee, Owusu-Ansah gave chase and was able to apprehend appellant. (Tr. at 42-43.) "[H]e briefly tripped and I caught up to him. We had a small little tussle. Then I was able to get him to the ground, secure his hands, and wait for officers to arrive to assist." (Tr. at 46.) During the search, Owusu-Ansah found a BB gun in appellant's pocket. (Tr. at 44.)

{¶ 6} On cross-examination, Owusu-Ansah did not recall observing any blood on appellant or his clothes during the arrest. (Tr. at 50.) Owusu-Ansah also did not observe an orange coat. (Tr. at 50.) On redirect examination, Owusu-Ansah stated that the BB gun "[a]bsolutely" looked like a real firearm. (Tr. at 52.)

{¶ 7} Jennifer Holmes is an officer with the Columbus Division of Police. (Tr. at 53-54.) On August 17, 2019, Holmes responded to a dispatch at 50 West 9th Avenue concerning a sexual assault. (Tr. at 55.) Upon arriving at the location, Holmes spoke with the victim, T.B. (Tr. at 56.) Holmes observed that T.B. "was visibly shaken, upset, terrified. She was crying." (Tr. at 56.) T.B. told Holmes that she was walking to her boyfriend's house when a black male approached. The individual "pulled out a handgun, brandished the handgun towards her, and demanded that she give him all of her property." (Tr. at 56.) Once T.B. turned over her property, the individual, while brandishing the gun, instructed her to walk between the houses. The individual told her to "pull up her dress; and it was at that point where he raped her anally, vaginally, and orally." (Tr. at 56.) Holmes observed blood on T.B.'s hands and scratches on her shoulders and arms. (Tr. at 57.)

{¶ 8} On cross-examination, Holmes recalled that T.B. stated she ran to her boyfriend's house after the incident. (Tr. at 58.) T.B. noted that the rape occurred between 64 and 68 West 9th Avenue. (Tr. at 59.) Holmes recalled that T.B.'s scratches "looked fresh." (Tr. at 59.)

{¶ 9} After a brief recess, the trial court went back on the record and informed appellant that it had come to the court's attention that "when dismissing the jury panel for their lunch break, Mr. Rodgers, some of your family members caused a commotion both inside and outside of the courtroom that may or may not have been overheard by the jury." (Tr. at 63.) The state noted that appellant's mother made the outburst and requested that she be removed from the courtroom. (Tr. at 65.) The mother stated that she did not try to intimidate or direct her comments at any individual. (Tr. at 67.) The trial court barred appellant's mother from the courtroom for the remainder of the trial. (Tr. at 69.) After admonishing the audience against any further outbursts, trial court questioned the jury "to see what they may have seen or heard during their lunch break." (Tr. at 64-65.)

{¶ 10} When the trial court questioned the jury as to whether they had overheard any commotion or shouting as they exited the building, two jurors, Juror No. 2 and 13,

indicated in the affirmative. (Tr. at 70-71.) The trial court dismissed the jury and questioned Juror No. 2 and 13 individually about the incident. When exiting the courtroom, Juror No. 2 overheard people in a small crowd state, "they were frustrated about the proceedings and thought that the jury misrepresented the defendant." (Tr. at 71.) Juror No. 2 characterized it as "very awkward that [they] were walking past the whole situation." (Tr. at 72.) When asked whether they could still be fair and impartial during the trial, Juror No. 2 responded, "Absolutely." (Tr. at 72.) Juror No. 13 similarly overheard a loud discussion regarding who was on the jury, and that the group believed it could potentially be unfair. (Tr. at 73-74.) Juror No. 13 stated that the discussion was "[a] little uncomfortable." (Tr. at 74.) When asked whether Juror No. 13 believed they could still be impartial, Juror No. 13 responded, "Yes." (Tr. at 74.) Both attorneys indicated that they did not have any objection to the two jurors remaining on the jury. (Tr. at 74-75.)

{¶ 11} A.B. is friends with the victim, T.B. (Tr. at 78.) On the night in question, A.B. went out with a group of friends to celebrate her birthday. (Tr. at 80.) A.B. and T.B. were together all night and frequented various bars around town. (Tr. at 81-82.) A.B. characterized T.B.'s consumption of alcohol as "not too much. She never really overdid it with alcohol." (Tr. at 82.) At the end of the night, A.B. planned to stay at T.B.'s boyfriend's house. (Tr. at 84.) A.B. noted that parking was especially difficult as it was move-in weekend at OSU. (Tr. at 87.) Upon parking down the road from the house, A.B. became ill. (Tr. at 84.) According to A.B., the plan was for T.B. to "walk to her boyfriend's apartment and meet us there. She grabbed my stuff because at that point I had been drinking a lot, and she just wanted to make sure I had everything I needed." (Tr. at 84-85.) A.B., with the assistance of another friend that was driving that night, planned to meet outside T.B.'s boyfriend's house. (Tr. at 85.) When T.B. did not come back, they paced the area and called T.B.'s cellphone. (Tr. at 85.) When T.B. did not respond, the other friend drove A.B. back to her home. (Tr. at 86.) A.B. recalled that her social security card "was with my stuff that [T.B.] grabbed." (Tr. at 87.)

{¶ 12} On cross-examination, A.B. explained that because law enforcement had an older email address, there was a delay in reaching her about the case. (Tr. at 92.) A.B. acknowledged that she might have previously picked up T.B. from her boyfriend's house,

but it had been dark, and she was not familiar with the area. (Tr. at 95-96.) A.B. conceded that she did not see what happened regarding the alleged rape. (Tr. at 98.)

{¶ 13} On August 16, 2019, T.B. was 24 years old and lived in the Clintonville neighborhood of Columbus, Ohio. (Tr. at 111.) That evening, T.B. and others went out to celebrate A.B.'s birthday. (Tr. at 112-113.) Throughout the course of the evening, T.B. drank "one and a half, like, White Claws. It wasn't much at all." (Tr. at 116.) "I'm not a really big drinker." (Tr. at 115.) After the last bar closed, T.B. suggested they go back to her boyfriend's house for the night. (Tr. at 117.) Because it was move-in day at OSU, they parked a few blocks away. (Tr. at 117.) T.B. approximated that they arrived around 4:30-5:00 in the morning. (Tr. at 118.) When A.B. started to get sick, T.B. told the driver that she "could go ahead and start to get that little bed together for her." (Tr. at 118.) T.B. grabbed A.B.'s belongings, including her wallet, and started walking to her boyfriend's house. (Tr. at 119.) According to T.B., she observed a man walk by her in the opposite direction but did not think much of it at the time. (Tr. at 120.) When T.B. got a house or two away from her boyfriend's apartment, she heard someone "aggressively yell" in her direction. (Tr. at 120.) T.B. turned around and saw a gun in her face. (Tr. at 121.) T.B. described the individual as an African American male wearing an orange hoodie, a sweatshirt over his mouth, and gray pants with white stripes on the side. (Tr. at 121-122, 127.) The man asked if she had any money. "I was trying to, like, take off my backpack to just see if I could just give it to him and maybe he would leave me alone." (Tr. at 121.) When T.B. told the individual that she did not have any cash, he demanded that she go between two houses, take off her underwear, and lift up her dress. (Tr. at 122.) "I didn't really know what to do. I was just so scared. I just didn't want to die." (Tr. at 122.) T.B. testified that the individual forced her to get on her knees and put his penis in her mouth. (Tr. at 122.) "[H]e pulled me by the hair, got me up, and then turned me around; and I was against the brick wall, and he tried to — he tried to penetrate me anally. And it didn't work. He tried to force himself in and it hurt and it didn't work. Then he tried to do the same thing vaginally, and it didn't work. So then he made me give him oral again, and at that point I asked him if he could put his gun away because I didn't want to die and I was so scared. . . . He put it in his pocket." (Tr. at 123.) T.B. continued stating that the individual then "got me back up and pushed me against the brick wall again. And then he was able to penetrate

me vaginally, and then he -- then he was able to penetrate me anally.  And it just hurt really bad, and I didn't really know what was going on. . . . I was like, making noises, I guess, and he was mad at me.  He told me to shut up or he'll kill me." (Tr. at 124.)  T.B. recalled that the individual stated, "Are you shitting on me, is what he told me, and I -- I don't know.  I don't know. . . . I was scared." (Tr. at 124.)  T.B. testified that the individual "stopped, and then forced me back down and made me give oral again to him. . . . And I think at that point he had had enough, so he made me get off of him.  He just threw me back.  He had me by the hair and -- and then I was able to get up.  I saw that he was -- it looked like he was masturbating." (Tr. at 124-125.)  T.B. stated that when she was forced to give the individual oral sex, he still had feces all over his penis.  (Tr. at 135-136.)  T.B. stated that the individual "told me that he has my ID and he has my address and that if I say anything, then he'll kill me." (Tr. at 125.)  T.B. left her things and initially walked away.  (Tr. at 125.)  When she got beyond the bushes, T.B. ran to her boyfriend's house.  (Tr. at 125.)  When T.B. told her boyfriend what happened, he called 9-1-1.  (Tr. at 126.)  After speaking to law enforcement, they told her that a suspect was apprehended.  When T.B. went into the ambulance, law enforcement "flashed lights on him." (Tr. at 126.)  T.B recognized the individual's pants because "they were all I focused on while it happened.  I didn't want to look at him in the face. . . . I was scared. . . . I just looked at his pants and his shoes the whole time." (Tr. at 126.)  When asked if the individual that the police showed her was the individual that raped her, T.B. responded, "Yes." (Tr. at 126.)  T.B. went to a hospital where a nurse took swabs of her hands, vagina, anus, and mouth.  (Tr. at 128.)  T.B. identified the underwear and dress she was wearing that evening.  When asked what was on the bottom of the dress, T.B. stated, "probably feces maybe or blood or mud." (Tr. at 129.)  T.B. went on to identify a photograph of the area between the two houses where the rape took place.  (Tr. at 131.)  T.B. also identified the gun that was pointed at her during the rape.  (Tr. at 132.)

{¶ 14}  On cross-examination, T.B. stated that A.B. chose the bars that evening.  (Tr. at 137.)  T.B. did not see if the individual ejaculated.  (Tr. at 144.)  T.B. explained that she did not eat or brush her teeth immediately after the rape because she "didn't want to mess up any DNA or anything." (Tr. at 145.)  T.B. recalled that she had blood on her hand and shoulder from the brick.  (Tr. at 146.)

{¶ 15} In 2019, Pamela Hammond was a sexual assault nurse examiner ("SANE nurse") at the OSU Emergency Department. (Aug. 30, 2023 Vol. 2, A.M. Session, Tr. at 168-169.) After providing her education and training background, Hammond was declared an expert in forensic sexual assault exams. (Tr. at 171.) Hammond described the typical process and examination when a patient comes into the ER who reported sexual abuse. (Tr. at 172-174.) On August 17, 2019, Hammond conducted a sexual assault examination on T.B. (Tr. at 175.) T.B. stated to Hammond that she was vaginally, anally, and orally penetrated by the assailant's penis. (Tr. at 181.) Hammond noted abrasions to T.B.'s right and left shoulders as well as an abrasion to the right hand with "dried brown and red substances on the palms." (Tr. at 186.) Regarding injuries to her anus, Hammond testified there was "[s]cant bright red blood on perianal area, which means the area surrounding the anus." (Tr. at 187.) Hammond reported that her examination of the vagina found "no visible injury," but she wrote below "[b]rown substance noted." (Tr. at 188.) During the examination, Hammond collected several swabs as well as clothing from the victim. (Tr. at 188-194.) Hammond testified that everything was placed into a box, which is then sealed with red evidence tape. Hammond then signed her name across the tape. (Tr. at 195.)

{¶ 16} On cross-examination, Hammond recalled that T.B. had not urinated, vomited, or bathed since the assault. (Tr. at 198-199.) T.B. also reported that she had not brushed her teeth since the assault as well. (Tr. at 200.) Hammond described T.B.'s emotional status as "depressed, but she's calm and cooperative." (Tr. at 201.)

{¶ 17} Terry Stuart is a detective in the sexual assault unit with the Columbus Division of Police. (Tr. at 210-211.) On the night in question, Stuart responded to a call for service involving a sexual assault near OSU's campus. (Tr. at 212, 227.) Stuart, along with Detective Perry, later interviewed appellant at police headquarters. (Tr. at 212, 214.) According to Stuart, appellant stated that he was out for a morning jog with "a BB gun in his right pocket." (Tr. at 214.) Appellant stated that he ran across a woman on the ground looking through a bag. When he approached, the gun fell out of his pocket. (Tr. at 214.) While the woman was initially frightened, appellant explained that it was a BB gun and helped the woman look for the missing items. (Tr. at 214.) "And at some point she thought he was attractive and offered to perform fellatio on him, which he agreed to." (Tr. at 214.)

During a second interview, appellant admitted to not only engaging in oral sex but vaginal and anal sex as well. (Tr. at 214-215.)

{¶ 18} Stuart described appellant's pants as having a white stripe with an Adidas logo. (Aug. 30, 2023 Tr. Vol. 2, P.M. Session, at 224.) Stuart collected a DNA sample from appellant. (Tr. at 224.) Stuart conducted a follow-up interview with T.B. at the scene to "ensure we had the proper location where the incident occurred and if she had any other details of the incident." (Tr. at 226, 232.) Stuart testified to pictures taken of the crime scene and noted that there were items left on the grass after the incident, which included a Kroger Plus car and T.B.'s state ID. (Tr. at 228-229.) Stuart described appellant during the second interview as "talkative." (Tr. at 230-231.)

{¶ 19} On cross-examination, Stuart acknowledged that he did not observe any blood or fecal matter on appellant. (Tr. at 236-237.) Stuart conceded that while appellant admitted to having sex with T.B., he stated it was not rape. (Tr. at 238-239.)

{¶ 20} Kristy Brookover is a forensic scientist II in the Columbus Police Crime Lab in the DNA Section. (Tr. at 243.) Brookover conducted the analysis of appellant's DNA and wrote a report as to her findings in the case. (Tr. at 257.) Brookover testified that the sexual assault kit included a vaginal swab (001-A1), anal/perianal swab (001-A2), oral swab (001-A3); left hand swab (001-A4); and right hand swabs (001-A5 and 001-A6). (Tr. at 261-262.) Brookover concluded that the Y-STR profile for the vaginal swab was consistent with the Y-STR profile for appellant. (Tr. at 266.)

{¶ 21} After the close of the state's case, counsel for appellant moved for dismissal pursuant to Crim.R. 29. Counsel argued that there was insufficient evidence for conviction. After the state's response, the trial court denied the Crim.R. 29 motion. Counsel for appellant then rested his case and renewed the prior Crim.R. 29 motion, which the trial court denied. After closing arguments, the trial court read the jury instructions. The jury then retired to the jury room to begin deliberations.

{¶ 22} On August 31, 2023, the jury returned guilty verdicts on all eight counts of the indictment. The trial court ordered a presentence investigation and set the matter for a sentencing hearing. A sentencing hearing was held on September 27, 2023. At the conclusion of the hearing, the trial court sentenced appellant to an aggregate indefinite term of 45 years to an indefinite maximum term of 48.5 years in prison.

{¶ 23} Appellant filed a timely notice of appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 24} Appellant assigns the following as trial court error:

(1) The trial court erred in failing to dismiss/replace the jurors who overheard Defendant's Mother's outburst.

(2) The trial court erred in failing to grant Rule 29 dismissal in favor of Defendant.

(3) Defendant was denied the effective assistance of counsel in violation of the Sixth Amendment and the Ohio Constitution.

(4) The jury's verdicts are against the manifest weight of the evidence where critical elements of the offenses were not established.

(5) Sentencing entry incorrectly reflects a plea rather than a jury verdict.

## III. LEGAL ANALYSIS

### A. Appellant's First Assignment of Error

{¶ 25} In appellant's first assignment of error, he contends that the trial court erred by failing to dismiss the jurors that overhead an outburst by his mother during the trial.

{¶ 26} Generally, the decision to disqualify a juror for bias is a discretionary function of the trial court that will not be reversed absent an abuse of discretion. *State v. Orlandi*, 2006-Ohio-6039, ¶ 8 (10th Dist.), citing *Berk v. Matthews*, 53 Ohio St.3d 161, 168 (1990). Relatedly, "[w]hen an emotional outburst takes place in court, the issue is whether the outburst 'deprived the defendant of a fair trial by improperly influencing the jury.' " *State v. Trimble*, 2009-Ohio-2961, ¶ 126, quoting *State v. Scott*, 2004-Ohio-10, ¶ 44. Because these questions invariably depend on facts and circumstances that cannot typically be gleaned from the record, the trial court is tasked, as a question of fact, to determine whether the outburst deprived the defendant of a fair trial. *State v. Roberts*, 2024-Ohio-2957, ¶ 62 (11th Dist.). "Absent clear evidence in the record that the outburst improperly affected the jury, only the trial judge can authoritatively determine whether the jury was disturbed, alarmed, shocked[,] or moved by the demonstration or whether the incident was of such a nature that it necessarily influenced the ultimate verdict of conviction." (Citation omitted.) *Id*.

{¶ 27} As an initial matter, counsel for appellant failed to object to the two jurors remaining on the jury. As such, our review is limited to whether the trial court committed plain error. *See, e.g., State v. D.W.*, 2019-Ohio-2193, ¶ 7 (10th Dist.), citing *State v. Hairston*, 2001 Ohio LEXIS 4647 (10th Dist. Oct. 18, 2001). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). Plain error exists when the error is an obvious defect in the trial proceedings and that the error affects substantial rights. *D.W.* at ¶ 7, citing *State v. Barnes*, 2002-Ohio-68.

{¶ 28} When the parties reconvened after a break, the state noted for the record that appellant's mother made various statements in front of members of the jury and requested that she be removed from the courtroom. (Tr. at 65.) The trial court broached the subject with the mother, and it ultimately excused her from the courtroom for the remainder of the trial. After warning the audience against any further outbursts, the trial court questioned the jury "to see what they may have seen or heard during their lunch break." (Tr. at 65.) When the trial court asked whether any members of the jury had overheard any commotion or shouting as they exited the building, two jurors indicated in the affirmative. (Tr. at 70-71.) Juror No. 2 provided that some individuals "were just frustrated about the proceedings and thought that the jury misrepresented the defendant." (Tr. at 71.) Juror No. 2 characterized it as "very awkward that [the jurors] were walking past the whole situation." (Tr. at 72.) When the trial court asked Juror No. 2 whether they could still be fair and impartial during the trial, Juror No. 2 responded, "Absolutely." (Tr. at 72.) Similarly, Juror No. 13 overheard a loud discussion about who was on the jury, and that the group believed it could potentially be unfair. (Tr. at 73-74.) Juror No. 13 characterized the discussion as "[a] little uncomfortable." (Tr. at 74.) When the trial court asked whether Juror No. 13 could still be impartial, they responded, "Yes." (Tr. at 74.) Prior to deliberations, the trial court instructed the jury to not consider any statements stricken from the record or that they were instructed to disregard.

{¶ 29} Based on the nature of the statements made during the outburst and responses of the jurors, we find no error, plain or otherwise, in the trial court's determination that the jurors should not be excused. The trial court appropriately handled the issue by questioning the jurors regarding the comments and receiving assurances from

them that they could remain impartial. *See, e.g., State v. Samueal*, 2023-Ohio-3322, ¶ 22 (1st Dist.), citing *State v. McGlothin*, 2007-Ohio-4707, ¶ 16 (1st Dist.). Moreover, we presume that the jury complied with the trial court's instructions to disregard the outburst. *Hymes v. Fender*, 2024 U.S. Dist. LEXIS 169760, *65 (N.D.Ohio Jan. 30, 2024).

{¶ 30} Accordingly, appellant's first assignment of error is overruled.

## B. Appellant's Second and Fourth Assignments of Error

{¶ 31} In appellant's second assignment of error, he argues that the trial court erred by failing to grant his Crim.R. 29 motion for dismissal. In appellant's fourth assignment of error, he contends that the jury's verdict was against the manifest weight of the evidence. For ease of discussion, we will address both assignments of error together.

### 1. Standards of Review

{¶ 32} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Frazier*, 2025-Ohio-2992, ¶ 21 (10th Dist.), citing *State v. King*, 2025-Ohio-918, ¶ 19 (10th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Regarding the former, " 'whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial.' " *King* at ¶ 20, quoting *State v. Harris*, 2023-Ohio-3994, ¶ 14 (10th Dist.), citing *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.). When reviewing a sufficiency challenge, "we assume the state's witnesses testified truthfully and determine whether that testimony and any other evidence presented at trial satisfied each element of the offense." *State v. Perry*, 2025-Ohio-2054, ¶ 58 (10th Dist.). Legal sufficiency is a question of law that considers whether the state's evidence meets a " 'test of adequacy.' " *State v. Elkhabiry*, 2025-Ohio-1028, ¶ 45 (10th Dist.), quoting *Thompkins* at 386. As such, evidence is legally sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to find that the state proved each element of the offense beyond a reasonable doubt. (Further citation omitted.) *Perry* at ¶ 58.

{¶ 33} In contrast, a challenge under manifest weight concerns the evidence's effect in inducing belief. *Frazier* at ¶ 22, citing *State v. Thomas*, 2024-Ohio-5662, ¶ 16 (10th Dist.), citing *State v. Stewart*, 2024-Ohio-1448, ¶ 23 (10th Dist.), citing *State v. Cassell*, 2010-Ohio-1881, ¶ 38 (10th Dist.), citing *State v. Wilson*, 2007-Ohio-2202, ¶ 25. Manifest

weight challenges the credibility of the evidence presented and considers whether the state met its burden of persuasion. (Further citation omitted.) *King* at ¶ 22. " 'Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis.' " *State v. R.J.C.*, 2024-Ohio-1670, ¶ 30 (10th Dist.), quoting *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *King* at ¶ 22, citing *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), citing *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 34} The manifest-weight-of-the-evidence standard requires a reviewing court to consider the state's evidence as an additional or "thirteenth juror." *Frazier* at ¶ 23, citing *Elkhabiry* at ¶ 37, citing *Thompkins* at 387. " 'To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial.' " *Id.*, quoting *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387. Reversal under the manifest weight of the evidence is only appropriate in "exceptional case[s] in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

**2. Robbery**

{¶ 35} Appellant was indicted on two counts of robbery in violation of R.C. 2911.02(A)(2) and (3), which provides:

> (A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> . . .
>
> (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
>
> (3) Use or threaten the immediate use of force against another.

{¶ 36} Preliminarily, appellant's brief provides that the state failed to present sufficient evidence to sustain a conviction for "aggravated robbery." (Appellant's Brief at 32.) Appellant, however, was convicted of *robbery* under R.C. 2911.02. In any case, appellant argues that the state failed to present sufficient evidence based on the lack of a

stolen item on him at the time of the arrest as well as the lack of evidence of a completed theft.  (Appellant's Brief at 33.)

{¶ 37} During the trial, the state presented evidence of two separate acts that constitute robbery under the statute.  The state posited that the first robbery occurred when appellant pointed a BB gun at T.B. and demanded money.  According to T.B., when she went to prepare a bed for A.B., she observed a man walk by her in the opposite direction. (Tr. at 120.)  When T.B. got a house or two from her boyfriend's apartment, she heard someone "aggressively yell" in her direction. (Tr. at 120.) T.B. then turned around and saw a gun in her face. (Tr. at 121.)  The individual asked if she had any money, and she told him no.  The state presented evidence that a second robbery occurred when appellant took A.B.'s social security card and threated to kill T.B. if she told anyone about the rape.  At trial, T.B. testified that she grabbed A.B.'s belongings, including her wallet, before walking to her boyfriend's house. (Tr. at 119.) A.B. provided support for T.B.'s account as she also recalled having her social security card in her wallet at that time. (Tr. at 86-87.)  T.B. testified that after the sexual assault, appellant "told [her] that he has my ID and he has my address and that if I say anything, then he'll kill me." (Tr. at 125.)

{¶ 38} Upon review, we find both counts of robbery were supported by sufficient evidence.  Appellant's contention that the elements were not satisfied is unpersuasive.  The statutory elements of R.C. 2911.02(A)(2) and (A)(3) at issue concern "threat[] to inflict" and "threaten the immediate use of" harm.  The threat to use the BB gun and to kill T.B. if she disclosed the rape would satisfy the respective elements.  Appellant's contention that there was insufficient evidence based on the lack of a completed theft is similarly unavailing. There is evidence that, viewed in the light most favorable to the state, would demonstrate that appellant completed the theft offense.  At trial, Branford testified that when he attempted to detain appellant, he "took off running." (Tr. at 23.)  After a brief chase, appellant was ultimately apprehended. (Tr. at 23.)  Branford recalled that during his pursuit of appellant, "it appeared that something came off of his body or he threw something or lost something along the way." (Tr. at 23.)  When Branford retraced the steps of the chase, he found a black T-shirt and a social security card. (Tr. at 24.)  Regardless, R.C. 2911.02(A) merely requires that the state show that appellant "*attempt*[*ed*] . . . a theft offense." (Emphasis added.)  As such, under the statute, the state was not required to show

appellant succeeded in committing a theft offense as his demand for cash while pointing a BB gun at T.B. and taking the social security card before dropping it while fleeing from law enforcement, viewing the evidence in a light most favorable to the state, would satisfy the elements of R.C. 2911.02.

### 3. Kidnapping

{¶ 39} Appellant was also indicted for kidnapping under alternative subsections of R.C. 2905.01(A)(2) through (A)(4), which provides:

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> . . .
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;
>
> (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]

{¶ 40} Stated another way, the state was required to prove that appellant "by force, threat, or deception" removed T.B. from the place she was found or restrained her liberty in order to (1) "facilitate the commission of a felony"; (2) "to terrorize or inflict serious physical harm"; or (3) "to engage in sexual activity." R.C. 2905.01(A)(2) through (4).

{¶ 41} Appellant contends that the evidence was insufficient as there was "conflicting evidence" regarding whether T.B. went to the area voluntarily. (Appellant's Brief at 34.)

{¶ 42} The state presented evidence that appellant pointed a BB gun at T.B., forced her to leave the sidewalk, and walk to the area between the two houses where he robbed and raped her. T.B. testified that when she told appellant that she did not have any cash, he demanded that she go between two houses, take off her underwear, and lift up her dress. (Tr. at 122.) "I didn't really know what to do. I was just so scared. I just didn't want to die." (Tr. at 122.)

{¶ 43} Conversely, appellant argued that T.B. left the sidewalk voluntarily in order to engage in consensual sexual activity. As set forth previously, when reviewing a sufficiency challenge, "we assume the state's witnesses testified truthfully and determine

whether that testimony and any other evidence presented at trial satisfied each element of the offense." *Perry* at ¶ 58. Legal sufficiency considers whether the state's evidence satisfies a " 'test of adequacy.' " *Elkhabiry* at ¶ 45, quoting *Thompkins* at 386. While appellant is correct that there are conflicting accounts, under our review for sufficiency of the evidence, we are tasked with considering whether the state presented evidence that, if believed, would allow any rational trier of fact to find that the state proved each element of the offense beyond a reasonable doubt. *Perry* at ¶ 58. Considering the testimony presented at trial, the state has met its burden and presented sufficient evidence to support appellant's conviction for kidnapping.

### 4. Rape

{¶ 44} Finally, appellant contends that the state failed to present sufficient evidence of rape. Appellant was indicted on five counts of rape under R.C. 2907.02(A)(2), which directs, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The state presented evidence of five instances of oral, vaginal, or anal rape. According to T.B., appellant forced her to get on her knees and put his penis in her mouth. (Tr. at 122.) "[H]e pulled me by the hair, got me up, and then turned me around; and I was against the brick wall, and he tried to — he tried to penetrate me anally. And it didn't work. He tried to force himself in and it hurt and it didn't work. Then he tried to do the same thing vaginally, and it didn't work. So then he made me give him oral again, and at that point I asked him if he could put his gun away because I didn't want to die and I was so scared. . . . He put it in his pocket." (Tr. at 123.) Appellant then "got me back up and pushed me against the brick wall again. And then he was able to penetrate me vaginally, and then he -- then he was able to penetrate me anally." (Tr. at 124.) T.B. continued stating, "[t]hen he stopped, and then forced me back down and made me give oral again to him. . . . And I think at that point he had had enough, so he made me get off of him. He just threw me back. He had me by the hair and -- and then I was able to get up. I saw that he was -- it looked like he was masturbating." (Tr. at 124-125.) T.B.'s account is consistent with Hammond's recollection and notes from her examination that provided T.B. was vaginally, anally, and orally penetrated by the assailant's penis. (Tr. at 181.). T.B.'s account at trial is also generally consistent with her prior accounts to law enforcement.

{¶ 45} Appellant makes two arguments to combat the sufficiency of the evidence. First, appellant contends that there was no conclusive DNA evidence presented at trial. This is easily refuted by the evidence in the record. Brookover conducted the DNA analysis in this case and concluded that the Y-STR profile for the vaginal swab was consistent with the Y-STR profile for appellant. (Tr. at 257, 266.) Given appellant admitted to engaging in sexual activity with T.B., though claiming that the encounter was consensual, the Y-STR profile from the vaginal swab would certainly qualify as conclusive DNA evidence. Next, appellant argues that there was insufficient evidence of sexual conduct with T.B. that demonstrates that she was compelled by force or threat of force. Appellant posited that the "physical evidence showed no tearing of tissues and no bruising beyond the victim's shoulders, which [was] inconsistent with forcible sexual conduct." (Appellant's Brief at 34-35.) At trial, Stuart testified regarding his two interviews of appellant. According to Stuart, appellant stated that he was out for a morning jog with "a BB gun in his right pocket." (Tr. at 214.) Appellant ran across a woman on the ground looking through a bag. When he approached, the gun fell out of his pocket. (Tr. at 214.) While the woman was initially frightened, appellant explained that it was a BB gun and helped the woman look for the missing items. (Tr. at 214.) "And at one point she thought he was attractive and offered to perform fellatio on him, which he agreed to." (Tr. at 214.) During a second interview, Appellant admitted to not only engaging in oral sex but vaginal and anal sex as well. (Tr. at 214-215.) Stuart conceded that while appellant admitted to having sex with T.B., he stated it was not rape. (Tr. at 238-239.)

{¶ 46} As set forth previously, T.B. testified to multiple instances of oral, vaginal, and anal rape. T.B.'s testimony was generally consistent with her prior statements of the incident. Moreover, in addition to abrasions on T.B.'s shoulders, Hammond noted an abrasion to T.B.'s right hand with "dried brown and red substances on the palms." (Tr. at 186.) Regarding injuries to T.B.'s anus, Hammond testified there was "[s]cant bright red blood on perianal area, which means the area surrounding the anus." (Tr. at 187.) During Hammond's examination of the vagina, she observed there was "no visible injury" but wrote below that there was a "[b]rown substance noted." (Tr. at 188.) Considering the evidence in a light most in favorable of the state, most notably T.B.'s testimony at trial, we find the state presented sufficient evidence for each of the five counts of rape.

**5. Manifest Weight**

{¶ 47} In appellant's fourth assignment of error, he contends that the verdicts were against the manifest weight of the evidence. Upon review, appellant's arguments largely mirror his arguments regarding sufficiency of the evidence. Briefly, appellant argues that the conviction for robbery[1] was against the manifest weight of the evidence as "[t]he absence of stolen items on [appellant] and the lack of testimony confirming a completed theft render the victim's account unreliable." (Appellant's Brief at 49.) Appellant contends the kidnapping conviction was against the manifest weight of the evidence based on conflicting accounts regarding whether T.B. voluntarily moved to the area between the houses. (Appellant's Brief at 50.) Finally, appellant contends the jury's convictions for rape were against the manifest weight of the evidence due to the lack of physical evidence and corroboration. (Appellant's Brief at 51.)

{¶ 48} This court has previously found that " '[a] conviction is not against the manifest weight of the evidence because the [jury] chose to believe the state's version of events over the defendant's version.' " *State v. Abdullahi*, 2018-Ohio-5146, ¶ 30 (10th Dist.), quoting *State v. Hawk*, 2013-Ohio-5794, ¶ 59 (10th Dist.). In addition to the reasons provided that the state presented sufficient evidence at trial, we note that even if we accept that there was conflicting evidence at trial, given the facts of this case, we find the jury was in the best position to evaluate credibility and resolve the central and disputed facts. Based on our careful review of the record, we cannot conclude the jury clearly lost its way by convicting appellant of robbery, kidnapping, and rape.

{¶ 49} Accordingly, appellant's second and fourth assignments of error are overruled.

**C. Appellant's Third Assignment of Error**

{¶ 50} In appellant's third assignment of error, he contends that he was denied effective assistance of counsel.

{¶ 51} When raising a claim of ineffective assistance of counsel, a defendant must demonstrate "(1) counsel's performance was deficient or objectively unreasonable, as determined by 'prevailing professional norms,' and (2) counsel's deficient performance

---

[1] Again, counsel refers to appellant's conviction as aggravated robbery, which is incorrect. (Appellant's Brief at 49.)

prejudiced the defendant." (Further quotations omitted.) *State v. Brefford*, 2025-Ohio-4436, ¶ 45 (10th Dist.), quoting *State v. Spaulding*, 2016-Ohio-8126, ¶ 77, quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

{¶ 52} To demonstrate that trial counsel's performance was deficient or unreasonable, "the defendant must overcome the presumption that counsel provided competent representation and must show counsel's actions were not trial strategies prompted by reasonable professional judgment." *State v. Williams*, 2025-Ohio-1151, ¶ 52 (10th Dist.), citing *Strickland* at 689. As counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance, *see, e.g.*, *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998), tactical or strategic decisions, even if unsuccessful, do not typically constitute ineffective assistance of counsel. *Brefford* at ¶ 46, citing *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). "Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client." *Williams* at ¶ 52, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).

{¶ 53} Counsel's performance is deemed to have prejudiced the defendant when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bradley* at 142, quoting *Strickland* at 694. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694. When reviewing an ineffective assistance of counsel claim, we " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " *Williams* at ¶ 54, quoting *Strickland* at 697.

{¶ 54} Appellant first asserts that his trial counsel was ineffective by failing to object to the "continued [e]mpanelment of jurors who overheard an emotional outburst by Defendant's mother during a trial break." (Appellant's Brief at 37.) Counsel asserts there is no strategic reason to have kept them on the jury. (Appellant's Brief at 38.)

{¶ 55} Upon review, we find that counsel's failure to object to the jurors remaining on the panel was not deficient or unreasonable. The trial court questioned the jurors regarding the comments, and both jurors stated they could fairly participate in the remainder of the trial. Based on the record, neither of the jurors' remarks indicated any meaningful alarm or bias, merely that it was "awkward" and "uncomfortable." Appellant

fails to point to any case law, and we could find none, that counsel's failure to object to jurors remaining on a panel when they observe any type of outburst is inherently ineffective. The trial court aptly examined the jurors as to what they overheard and how the mother's remarks might impact their ability to remain impartial during the remainder of the proceedings. It is reasonable to think that defense counsel was satisfied with the jurors' answers and believed that leaving the jurors on the panel, one of which was an alternate, would be beneficial for his client. Any potential bias was further mitigated by the trial court's instruction that the jury should not consider any statements stricken from the record or that they were told to disregard.

{¶ 56} Next, appellant argues that counsel was ineffective based on his allegedly improper remarks during the trial. (Appellant's Brief at 40.) Appellant cites counsel's opening statement regarding the victim's actions after the rape. "I believe [T.B] will talk about there was feces on my client's penis, put it in her mouth, but she never ends up washing her mouth this whole time. She just goes to the hospital, never washed her mouth, which kind of like if, I'm thinking, any of us had feces in our mouth, the first thing we would do is try to get rid of it." (Tr. at 14.) Appellant also argues that counsel was ineffective by failing to object to references of the BB gun as a "gun" or "firearm." (Appellant's Brief at 46.)

{¶ 57} Upon review, we need not address the first prong under *Strickland* as, even if counsel's actions were deficient, appellant was not prejudiced as there was no reasonable probability that, but for the errors, the result of the proceeding would have been different. Given the volume of evidence, as set forth throughout this decision, we cannot find either error prejudiced appellant to satisfy the second prong under *Strickland*.

{¶ 58} Appellant's third assignment of error is overruled.

**D. Appellant's Fifth Assignment of Error**

{¶ 59} In appellant's fifth assignment of error, he contends the sentencing entry incorrectly reflects a plea rather than a jury verdict.

{¶ 60} We agree with appellant that the October 9, 2023 sentencing entry inaccurately states that he entered a plea rather than provide that he was found guilty by a jury following a trial. Because the trial court may correct clerical errors at any time, under Crim.R. 36, we remand this matter to the trial court to correct the clerical error in the

judgment entry to reflect that appellant did not enter a guilty plea but rather was found guilty pursuant to a jury verdict. *State v. Silguero*, 2002-Ohio-6103, ¶ 14 (10th Dist.), citing *State v. Lattimore*, 2002-Ohio-723 (1st Dist.); *see also State v. Diallo*, 2025-Ohio-920, ¶ 47 (10th Dist.).

{¶ 61} Appellant's fifth assignment of error is overruled but remanded for the limited purpose of allowing the trial court to correct the clerical error in the sentencing entry by issuing a nunc pro tunc entry.

## V. CONCLUSION

{¶ 62} Based on the foregoing, appellant's five assignments of error are overruled. We affirm the judgment of the Franklin County Court of Common Pleas but remand the matter to the trial court for the limited purpose of allowing it to correct the clerical error in the sentencing entry by issuing an appropriate nunc pro tunc entry.

*Judgment affirmed;*
*cause remanded to correct clerical error.*

DORRIAN and BEATTY BLUNT, JJ., concur.

_____